IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ROBERT RANDOLPH                                                                    PLAINTIFF

vs.                                          CIVIL NO. 05-5047

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION                        DEFENDANT

## MEMORANDUM OPINION

Robert Randolph (hereinafter "plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration denying his application for disability insurance benefits ("DIB"), under Title II of the Act.

## Background:

The application for DIB now before this court was filed on April 8, 2003, alleging an onset date of September 18, 2002, due to residual pain from a comminuted left tibial plateau fracture. (Tr. 10, 11, 46-48). An administrative hearing was held on May 6, 2004. (Tr. 229-251). Plaintiff was present and represented by counsel.

At the time of the administrative hearing on May 6, 2004, plaintiff was twenty-seven years old and possessed a high school education. (Tr. 11, 55, 60, 63, 232-234). The record reveals that he had past relevant work ("PRW"), as a truck mechanic, welder, and laborer. (Tr. 11, 55, 60, 63, 232-234).

On August 17, 2004, the Administrative Law Judge ("ALJ"), found that plaintiff had a severe impairment, but that his impairment did not meet or equal the criteria of any of the impairments

listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 16-17). After discrediting plaintiff's subjective allegations, the ALJ concluded that he maintained the residual functional capacity ("RFC"), to perform a range of sedentary work, limited by his ability to lift five pounds frequently and ten pounds occasionally; stand and/or walk a total of two hours per eight-hour workday; occasionally bend, crawl, climb stairs, and operate foot controls with his left leg; never squat and crouch; and, the need for a sit/stand option approximately every thirty to forty-five minutes. (Tr. 17). With the assistance of a vocational expert ("VE"), he determined that plaintiff retained the RFC to perform the positions of cashier, assembler, and bookkeeping clerk. (Tr. 17).

On January 24, 2005, the Appeals Council declined to review this decision. (Tr. 3-6). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. The plaintiff and Commissioner have filed appeal briefs, and the case is now ready for decision. (Doc. # 8, 9).

**Evidence Presented:**

On September 20, 2002, plaintiff was involved in a motorcycle accident and sustained a comminuted bicondylar tibial plateau fracture of the left leg with associated compartment syndrome. (Tr. 106). He underwent limited internal fixation with application of a hybrid external fixator on September 21, 2002. Due to impending compartment syndrome, however, plaintiff also underwent lateral and medial fasciotomies to the left calf. X-rays following surgery were unremarkable. (Tr. 145-147). On September 24, 2002, the left lateral calf wound was closed. (Tr. 110). Then, on September 26, 2002, Dr. Rodger Dickinson, Jr., closed the medial calf wound. (Tr. 109).

2

Subsequently, plaintiff was able to increase his activity. (Tr. 106). By September 28, 2002, he was afebrile and in a moderate amount of pain. Records indicate that plaintiff was ambulating via crutches and touchdown weightbearing. His wounds and his neurovascular status were noted to be intact. Accordingly, plaintiff was discharged home. Dr. Dickinson gave plaintiff a prescription for Percocet and prescribed continuous passive motion ("CPM"). (Tr. 106).

On October 1, 2002, plaintiff's wounds looked "fine." (Tr. 198). Dr. Dickinson indicated that plaintiff should work on touchdown weight-bearing, range of motion, and CPM. (Tr. 198).

On October 17, 2002, an x-ray of plaintiff's left leg showed good restoration of the anatomy of the tibial plateau. (Tr. 197). Dr. Dickinson noted that plaintiff continued to have problems with the pins, noting a few early pin track infections on the wires. He redressed everything and placed plaintiff on Keflex. Dr. Dickinson continued to limit plaintiff to touchdown weight-bearing and range of motion exercises. (Tr. 197).

On October 28, 2002, plaintiff reported a fair amount of pain. (Tr. 196). He was continuing to get pin track infections, so Dr. Dickinson scheduled him to have his external fixator removed. He also prescribed Percocet for the pain. (Tr. 196).

On October 29, 2002, plaintiff underwent a removal of the external fixation in the left tibia. (Tr. 154). An x-ray following the procedure noted a healing intraarticular fracture of the proximal tibia with a probable loose bone fragment in the lateral compartment of the knee. (Tr. 155). Dr. Dickinson noted that he tolerated the procedure well and was sent to recovery in good condition. (Tr. 154). Plaintiff was later released home with instructions not to perform weight-bearing activities.

3

(Tr. 156).

On November 8, 2002, plaintiff had a range of 5 to 100 degrees of motion in his left knee. (Tr. 195). Dr. Dickinson noted that it looked much better. It was not as swollen or tender as it had previously been. In addition, the x-ray looked "really good." As such, Dr. Dickinson told him to stick with touchdown weight-bearing and to wear his brace when up and active. (Tr. 195).

On November 22, 2002, Dr. Dickinson ordered physical therapy. (Tr. 194). He also released plaintiff to begin weight-bearing activity as tolerated to increase his range of motion. X-rays were unchanged. Dr. Dickinson noted that plaintiff would still need to use his crutches for another two weeks, but at the end of that two week period, he could begin just using his brace. (Tr. 194).

On November 25, 2002, plaintiff was admitted for physical therapy. (Tr. 164). By December 23, 2002, plaintiff indicated that his knee was feeling better. (Tr. 168). He stated that he was riding a bicycle at home, and that seemed to be helping. Although he continued to experience pain related to the use of his knee, on January 12, 2003, the physical therapist noted that he was doing well with his strengthening program. (Tr. 165). At that time, plaintiff was seven degrees away from full extension of his left knee. (Tr. 165).

On December 13, 2002, plaintiff reported putting more weight on his left leg. (Tr. 193). Although he still had a lot of swelling in his knee, he had almost a 15 degree flexion contracture with about 100 degrees of flexion. As x-rays were unchanged, plaintiff was advised to continue his exercises and wear his brace when he was up and ambulating. (Tr. 193).

On January 10, 2003, plaintiff had between 105 to 110 degrees of flexion, but continued to

4

have a flexion contracture of only ten degrees. (Tr. 192). As such, Dr. Dickinson opted to give him a Dyna splint to use at night to try and get him to full extension. An x-ray revealed some slight concerns regarding irregularity in the articular surface, but the fracture appeared to be healing. (Tr. 192).

On January 31, 2003, plaintiff remained in a fair amount of pain and discomfort. (Tr. 191). He indicated that his bicycle was helpful. Dr. Dickinson noted that plaintiff had a Dyna splint and that plaintiff now had about eight degrees flexion and twelve degrees contracture. He advised plaintiff to stay in the splint and encouraged him to ride his stationary bicycle daily. (Tr. 191).

On February 21, 2003, plaintiff's wounds were well healed. (Tr. 190). His range of motion was "pretty good," from about 5 degrees to 120 degrees. Plaintiff had some slight varus of his tibia, as well as discomfort with walking and ambulation. An x-ray revealed a faint fracture line medially, but the remainder of the fracture appeared to be healed. There was also some slight incongruence of the joint. Accordingly, Dr. Dickinson advised plaintiff to stick with his bicycle and prescribed Mobic. He also told plaintiff that he needed to find a "sitting job" to do because there was no way he was going to get back to doing any kind of heavy construction work requiring him to stand and walk. (Tr. 190).

On February 26, 2003, Dr. Dickinson wrote a letter indicating that plaintiff was still recovering from a severe injury to his left leg. (Tr. 189). He noted that plaintiff was still using one crutch to ambulate, did not yet have good function, and was unable to do any kind of prolonged standing, walking, stairs, stooping, or crawling. Accordingly, Dr. Dickinson opined that plaintiff was

not yet able to return to work. (Tr. 189).

On April 4, 2003, plaintiff was still using his cane to some degree. (Tr. 188). He was reportedly taking Mobic for pain, which did help. On examination, plaintiff had a good range of motion. However, there was still some tenderness and soreness. An x-ray showed good bone healing, but continued problems with the joint. Dr. Dickinson noted that plaintiff would develop arthritic changes and would need a sedentary job that did not require standing and walking. He advised plaintiff to look into vocational rehabilitation. (Tr. 188).

On April 20, 2003, plaintiff sought emergency treatment after slipping and twisting his left knee. (Tr. 173). An x-ray revealed only an old proximal left tibia fracture, but no acute process. (Tr. 177). As swelling was noted, the treating doctor removed fluid from plaintiff's knee. (Tr. 174). Following a diagnosis of knee effusion, plaintiff was discharged home with instructions to rest, elevate, and ice his knee. (Tr. 176). He was also told to use crutches and take pain medications as needed. (Tr. 176).

On April 21, 2003, Dr. Dickinson stated that plaintiff's knee effusion could be due to some sort of inflammatory arthritis. (Tr. 187). As such, he opted to keep him on anti-inflammatories and ice. (Tr. 187).

On April 24, 2003, plaintiff's knee had improved. (Tr. 186). Dr. Dickinson advised him to continue to use one crutch, slowly increasing his activity. (Tr. 186).

On May 8, 2003, progress notes reveal that plaintiff had less pain and swelling. (Tr. 185). He was wearing a brace and continuing with his exercises, including his bicycle. As far as his ability

to return to work, Dr. Dickinson indicated that the did not feel that plaintiff would ever be able to go back to the type of work he had previously performed. He stated that plaintiff would not be able to meet the standing and walking requirements, as his left knee would not tolerate it. (Tr. 185).

On May 29, 2003, plaintiff indicated that his left knee had improved. (Tr. 184). No effusion was present, but there was still residual compartment syndrome, crepitance, and some slight loss of motion. Without a doubt, Dr. Dickinson noted that plaintiff would develop traumatic arthritis. As such, he instructed plaintiff to find a job he could "sit at." Dr. Dickinson stated that plaintiff did not need to be doing any kind of work that would require him to stand and walk because his knee would not tolerate it. Further, he indicated that if plaintiff's knee flared up again, he would perform an arthroscope. Plaintiff was then told to wear his brace when he was up and about. (Tr. 184).

On July 30, 2003, plaintiff had a follow-up with Dr. Dickinson. (Tr. 183). An examination revealed a good range of motion, but continued pain with "a lot of activity." Due to what appeared to be a prominent screw over the lateral aspect of the knee, Dr. Dickinson ordered an updated x-ray of plaintiff's left knee. He noted that everything appeared to be healed, although plaintiff still had some incongruity in the joint. Dr. Dickinson also stated that plaintiff would develop some arthritic changes. The x-ray showed a comminuted tibial plateau fracture healed with three large screws in place with some varus deformity noted. Accordingly, plaintiff was restricted from performing any job requiring heavy manual labor, walking or standing. However, Dr. Dickinson released plaintiff to swim and bicycle for exercise. He then prescribed Tylenol during the day and Vicodin at night. (Tr. 183).

AO72A
(Rev. 8/82)

On January 9, 2004, plaintiff continued to have discomfort, especially with activity. (Tr. 210). He indicated that walking caused swelling and discomfort. At this time, plaintiff also voiced some problems concerning his right knee. He stated that he felt a pop in his knee when he squatted down the previous week. Since that time, he had experienced persistent pain. X-rays of both knees showed no evidence of fracture or dislocation in the right knee. However, there was some early osteophyte formation coming off of the medial compartment of the left knee. Dr. Dickinson indicated that plaintiff's left knee was showing some arthritic changes and would slowly worsen over time. As for his right knee, he was concerned that plaintiff might have a meniscal tear. Since plaintiff's condition had improved "a little bit," Dr. Dickinson placed him on Mobic. He stated that if plaintiff's right knee worsened, he would probably need an arthroscopy. (Tr. 210).

On May 10, 2004, Dr. Dickinson completed an RFC assessment. (Tr. 212-214). He indicated that plaintiff could sit for six hours during an eight-hour workday, stand for one hour, walk for one hour, and work for eight hours. (Tr. 212). With regard to lifting, Dr. Dickinson found that plaintiff was able to occasionally lift/carry up to ten pounds, but could never lift/carry anything heavier, due to injury to both legs. He stated that plaintiff could use his right foot for repetitive movements as in operating foot controls. (Tr. 213). Further, Dr. Dickinson noted that plaintiff could be continuously exposed to dust, fumes, and noise; frequently be exposed to unprotected heights, be around moving machinery, and be exposed to marked temperature changes; occasionally bend, reach above, and drive automotive equipment; and, never squat, crawl, climb, crouch, or kneel. (Tr. 213). He then indicated that plaintiff's pain was severe. (Tr. 214).

8

**Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevent him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his

disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**Discussion:**

We first address the ALJ's assessment of plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*. As the United States Court of Appeals for the

Eighth Circuit recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

Plaintiff has alleged disability due to the residual pain from a comminuted left tibial plateau fracture. (Tr. 10, 11, 46-48). At the onset, we note that the evidence does indicate that plaintiff was diagnosed with a fractured tibia following a motorcycle accident in September 2002. (Tr. 106). For this, he immediately underwent surgery. Progress notes indicate that plaintiff has progressed well since the date of his surgery. Dr. Dickinson has noted an increased range of motion and continual improvement in his condition. (Tr. 165, 183, 184, 186, 188, 190, 194, 195, 210). *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (holding that a condition that can be controlled or remedied by treatment cannot serve as a basis for a finding of disability). While we do note that plaintiff has continued to experience pain in his left leg and will likely experience arthritic changes, we also note that Dr. Dickson has repeatedly voiced his opinion that plaintiff would be able to perform a "sit down" job. (Tr. 165, 183, 184, 187, 188, 191, 196, 210). As such, we cannot say that the evidence establishes that plaintiff's condition is disabling.

We are cognizant of the fact that plaintiff's counsel argues that the ALJ erred by failing to develop the record further regarding plaintiff's problems with his right knee. Specifically, plaintiff contends that additional medical evidence existed that would support his claims regarding limitation in his right knee, that the ALJ was aware of the existence of this medical evidence, and that the ALJ failed to properly develop the record in this regard. It is significant to note that the ALJ did leave the record open for plaintiff's counsel to supplement it with this additional evidence, and plaintiff's

11

counsel failed to do so. (Tr. 236, 250). *See Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995). Further, the evidence of record does contain a progress note from Dr. Dickinson dated January 2004 indicating that plaintiff was experiencing pain in his right knee, and that the doctor suspected a meniscal tear. (Tr. 210).

Plaintiff contends that he saw Dr. Dickinson for a second visit regarding his knee in February 2004, at which time he was scheduled for an arthroscopy. (Tr. 239-240). According to the testimony, plaintiff never underwent this procedure. (Tr. 240). Then, in May 2004, Dr. Dickinson completed an RFC assessment stating that plaintiff was suffering from injuries to both knees, but that he remained capable of performing sedentary work. (Tr. 212-214). In fact, as noted by the ALJ, Dr. Dickinson stated that plaintiff could use his right leg for repetitive motions such as operating foot controls. (Tr. 212-214). Therefore, given the fact that Dr. Dickinson's assessment clearly takes into account plaintiff's bilateral knee problems and was dated after plaintiff indicates he last saw Dr. Dickinson regarding his knee, we do not believe that the ALJ erred by failing to seek further medical reports concerning plaintiff's right knee. *See id*. at 488 (holding that "reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial").

We also note that plaintiff testified that he was not taking any prescription pain medications for his condition. (Tr. 238, 242-243). *See Haynes v. Shalala*, 26 F.3d 812, 814 (8th Cir. 1994) (lack of strong pain medication was inconsistent with disabling pain). Instead, he indicated that he was taking Tylenol. *See Riggins v. Apfel*, 177 F.3d 689, 693(8th Cir.1999) (holding that the mere use of nonprescription pain medication is inconsistent with complaints of disabling pain). Although

12

plaintiff contends that his failure to take his prescription medication is due to financial constraints, there is no evidence to show that he attempted to avail himself of any of the medical or pharmaceutical services offered to indigent patients. *Murphy v. Sullivan*, 953 F.3d 383, 386-87 (8th Cir. 1992) (holding that lack of evidence that plaintiff sought low-cost medical treatment from her doctor, clinics, or hospitals does not support plaintiff's contention of financial hardship). Likewise, there are no notations in his medical records to show that plaintiff was in need of samples rather than a prescription for his medication. As such, we cannot say that plaintiff's financial condition prevented him from obtaining his medication.

Plaintiff's own reports concerning his activities of daily living also provide support for a finding that plaintiff is not disabled. On a supplemental interview outline dated April 15, 2003, plaintiff reported the ability to care for his personal hygiene, do the laundry, prepare sandwiches, drive, watch TV, and listen to the radio. (Tr. 71-72). In fact, he stated that he watched "a lot of TV." (Tr. 72). *See Prince v. Bowen*, 894 F.2d 283, 285 (8th Cir. 1990) (holding that ability to walk two and one-half blocks, watch TV, and listen to the radio were consistent with an ability to perform sedentary work).

Therefore, although it is clear that plaintiff suffers from some degree of pain, he has not established that he is unable to engage in any and all gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning his daily activities support plaintiff's

AO72A
(Rev. 8/82)

contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

Further, we can find no reason to discount the ALJ's decision to dismiss the testimony of plaintiff's wife, Angie Randolph. (Tr. 244-246). It is clear that her testimony merely corroborated plaintiff's testimony. Therefore, the same evidence that supported discounting plaintiff's testimony also supported discounting the testimony of this witness. *Wheeler v. Apfel*, 224 F.3d 891, 896 (8th Cir. 2000). Because the determination as to the weight given to witness statements was clearly within the ALJ's province, we find no error in his credibility determination. *See Siemers*, 47 F.3d at 302; *Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993).

Plaintiff also contends that the ALJ erred in finding that he maintained the RFC to perform a range of sedentary work. It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). The United States Court of Appeals for the Eighth Circuit has also stated that a "claimant's residual functional capacity is a medical question," *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), and thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam ), must support the determination of the plaintiff's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Nevland v. Apfel*, 2 04 F.3d 853, 858 (8th Cir. 2000). Therefore, in evaluating the plaintiff's RFC, *see* 20 C.F.R. § 404.1545(c), while not limited to considering medical evidence, an ALJ is required to consider at least some supporting evidence from a professional. *Cf. Nevland v. Apfel*, 204 F.3d

at 858; *Ford v. Secretary of Health and Human Servs.*, 662 F. Supp. 954, 955, 956 (W.D. Ark. 1987) (RFC was "medical question," and medical evidence was required to establish how claimant's heart attacks affected his RFC).

In the present case, the ALJ considered the medical assessment of a non-examining agency medical consultant, the RFC assessment of plaintiff's treating physician, plaintiff's subjective complaints, and his medical records. On June 21, 2003, Dr. Jerry Thomas, a non-examining, consultative physician, completed an RFC assessment. (Tr. 201-209). After reviewing plaintiff's medical records, he concluded that plaintiff could lift ten pounds occasionally and less than ten pounds frequently, stand and walk for two hours during an eight-hour workday, and sit for six hours during an eight-hour workday. (Tr. 202). However, he noted no other limitations. (Tr. 203-205).

As discussed above, the medical evidence does not indicate that plaintiff was suffering from any limitations that would prevent him from performing sedentary work. We note that plaintiff's treating physician, Dr. Dickinson, found that plaintiff could sit for six hours during an eight-hour workday, stand for one hour, walk for one hour, and work for eight hours. (Tr. 212). He also concluded that plaintiff was able to occasionally lift/carry up to ten pounds, but could never lift/carry anything heavier, due to injury to both legs. In spite of finding injuries to both legs, Dr. Dickinson went on to state that plaintiff could use his right foot for repetitive movements such as operating foot controls. (Tr. 213). The ALJ concluded that plaintiff maintained the RFC to lift five pounds frequently and ten pounds occasionally; stand and/or walk a total of two hours per eight-hour workday; occasionally bend, crawl, and climb stairs; never squat and crouch; and, required a sit/stand

15

option approximately every thirty to forty-five minutes. Further, he determined that, with difficulty, plaintiff could occasionally operate foot controls with his left leg. (Tr. 17). As this is clearly supported by the medical evidence of record, including the RFC assessment of plaintiff's treating physician, we find substantial evidence to support the ALJ's RFC determination.

We also find that substantial evidence supports the ALJ's finding that plaintiff could perform work as a cashier, assembly worker, and bookkeeping clerk. (Tr. 16). The ALJ presented the VE with a hypothetical example of an individual of plaintiff's age and education who could lift ten pounds occasionally and five pound frequently; push and pull within those same limitations; stand and walk at least two hours during an eight-hour workday; sit for up to six hours during an eight-hour workday; required a sit/stand option; would have difficulty but could occasionally operate foot controls with his left lower extremity with no limitations on his right; could occasionally bend, crawl, and climb stairs; and, could never squat or crouch. (Tr. 248). The VE testified that such a person could perform the positions of cashier, assembly worker, and bookkeeper/accounting and auditing clerk. (Tr. 249). The VE also testified that these jobs would remain available to plaintiff if he required a sit/stand option every thirty to forty-five minutes. (Tr. 249). As this hypothetical question took into consideration the limitations the ALJ concluded were actually caused by plaintiff's impairments, and which are supported by substantial evidence, the VE's testimony provided substantial evidence to support the ALJ's finding that plaintiff could perform the positions of cashier, assembly worker, and bookkeeper/accounting and auditing clerk. *See Depover v. Barnhart,* 349 F.3d 563, 568 (8th Cir. 2003) (holding that a VE's response to a properly posed hypothetical question

16

supplied substantial evidence to support ALJ's finding that plaintiff could return to PRW).

Finally, plaintiff contends that the ALJ failed to meet his burden of showing that the positions of cashier, assembly worker, and bookkeeper/accounting and auditing clerk existed in significant numbers. 20 C.F.R. § 416.966 defines work which exists in the national economy, as follows:

> (a) General. We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country.
> It does not matter whether-- (1) Work exists in the immediate area in which you live; (2) A specific job vacancy exists for you; or (3) You would be hired if you applied for work.
> (b) How we determine the existence of work. Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications. Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered "work which exists in the national economy". We will not deny you disability benefits on the basis of the existence of these kinds of jobs. If work that you can do does not exist in the national economy, we will determine that you are disabled. However, if work that you can do does exist in the national economy, we will determine that you are not disabled.
> (c) Inability to obtain work. We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exists in the national economy, but you remain unemployed because of-- (1)Your inability to get work; (2) Lack of work in your local area; (3) The hiring practices of employers; (4) Technological changes in the industry in which you have worked; (5) Cyclical economic conditions; (6) No job openings for you; (7) You would not actually be hired to do work you could otherwise do; or (8) You do not wish to do a particular type of work.
> (d) Administrative notice of job data. When we determine that unskilled, sedentary, light, and medium jobs exist in the national economy (in significant numbers either in the region where you live or in several regions of the country), we will take administrative notice of reliable job information available from various governmental and other publications. For example, we will take notice of-- (1) Dictionary of Occupational Titles, published by the Department of Labor; (2) County Business Patterns, published by the Bureau of the Census; (3) Census Reports, also published by the Bureau of the Census; (4) Occupational Analyses, prepared for the Social Security Administration by various State employment agencies; and (5) Occupational Outlook Handbook, published by the Bureau of Labor Statistics.
> (e) Use of vocational experts and other specialists. If the issue in determining whether

you are disabled is whether your work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue, we may use the services of a vocational expert or other specialist. We will decide whether to use a vocational expert or other specialist.

In the present case, the vocational expert testified that there were approximately 100 cashier positions in Northwest Arkansas, 1400 in the state, and 125,000 in the nation. (Tr. 249). Further, he indicated that there were approximately 100 assembly jobs in Northwest Arkansas, 1500 in the state, and 105,000 in the nation. As for the bookkeeping position, the expert concluded that there were 50 such positions in Northwest Arkansas, 750 in the state, and 90,000 in the nation. (Tr. 249). We note that an availability of 32,000 positions nationwide has been held to be existing in significant numbers in the national economy. *See Weiler v. Apfel*, 179 F.3d 1107, 1111 (8th Cir. 1999). Therefore, we hold that the evidence establishes that a significant number of jobs exist in the national economy that plaintiff can perform.

**Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 10th day of July 2006.

/s/ Bobby E. Shepherd
HONORABLE BOBBY E. SHEPHERD
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)